# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| BLUE OCEAN LEGACY TRUST, et al., | ) | CASE NO. 1:24-cv-01878-JPC |
| | ) | |
| Plaintiffs, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | |
| vs. | ) | **DEFENDANTS HEIDECORN,** |
| | ) | **VETRANO AND LUKASIK'S** |
| | ) | **MOTION FOR JUDGMENT ON THE** |
| ANDY LEFKOWITZ, et al., | ) | **PLEADINGS AND/OR FOR MORE** |
| | ) | **DEFINITE STATEMENT** |
| Defendants. | ) | |

Pursuant to Federal Rules of Civil Procedure 12(b)(6), 12(c) and 12(e), and Local Rule for the District of Northern Ohio 7.1, Defendants David Heidecorn, Thomas Vetrano and Trisha Lukasik (collectively the "HVL Defendants") move for judgment on the pleadings on Plaintiffs' Verified Complaint and/or seek a more definite statement. The HVL Defendants are all former members of the Locus Solutions, LLC ("Locus") Board of Managers (the "Board").

Plaintiffs' Complaint fails to state a claim against HVL Defendants for numerous independent reasons. First, Plaintiffs fail to meet the heightened pleading standard for their securities and common law fraud claims because they fail to allege the who, what, when, where and how of the purported misrepresentations made to them to induce their investments. Second, Plaintiffs do not plead facts to support their standing to bring direct and/or derivative claims against the HVL Defendants. Third, Plaintiffs cannot state a claim for breach of fiduciary duty where the Locus operating agreement limits the Board of Manager's liability for all business decision absent bad faith. Fourth, Plaintiffs' claims under the Ohio limited liability company statute similarly fail because of the express terms of the Locus Operation Agreement, which gives the Board full managerial discretion of Locus and none to Plaintiffs as members. Finally, Plaintiffs' catch-all

conspiracy claim fails as a matter of law because Plaintiffs cannot allege an underlying tort, nor any unlawful act independent from the conspiracy itself. Plaintiffs' claims should thus be dismissed in their entirety with prejudice.

In the alternative, the Court should require Plaintiff to provide a more definite statement of the who, what, when, where and why of their fraud claims, their standing to pursue direct and derivative claims against the HVL Defendants, the duty Plaintiffs claim the HVL Defendants breached and the facts to support the alleged conspiracy.

WHEREFORE, Defendants David Heidecorn, Thomas Vetrano and Trisha Lukasik request that the Court dismiss the Verified Complaint as against them or, in the alternative, order Plaintiffs to submit a more definite statement of their claims.

Date: January 31, 2025                     Respectfully submitted,

                                           /s/ Kevin M. Norchi
                                           _____
                                           KEVIN M. NORCHI (OH Bar No. 0034659)
                                           **FREEMAN MATHIS & GARY, LLP**
                                           3201 Enterprise Parkway, Suite 190
                                           Cleveland, OH 44122
                                           Telephone:     (216) 329-4875
                                           Facsimile:     (888) 356-3596
                                           E-mail:        kevin.norchi@fmglaw.com

                                           -and-

                                           A. NEIL HARTZELL (MA Bar No. 544752)
                                           **FREEMAN MATHIS & GARY, LLP**
                                           60 State Street, Suite 600
                                           Boston, MA 02109-1800
                                           Telephone:     (617) 963-5966
                                           E-mail:        neil.hartzell@fmglaw.com
                                           *Pro Hac Vice*

                                           -and-

JESSICA GRAY KELLY (MA Bar No. 666846)
**FREEMAN MATHIS & GARY, LLP**
60 State Street, Suite 600
Boston, MA 02109-1800
Telephone:     (617) 807-8953
E-mail:          jessica.kelly@fmglaw.com
*Pro Hac Vice*

*Attorneys for Defendants*
*David Heidecorn, Trisha Lukasik, and Thomas Vetrano*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 31st day of January, 2025, the foregoing Motion for Judgment on the Pleadings and/or For More Definite Statement was filed via the Court's electronic filing system (NextGen CM/ECF), which will send electronic notification of such filing to all parties represented by attorneys who are registered NextGen CM/ECF users.

/s/ Kevin M. Norchi

_____

Kevin M. Norchi
*One of the Attorneys for Defendants*
*David Heidecorn, Trisha Lukasik, and Thomas*
*Vetrano*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| BLUE OCEAN LEGACY TRUST, et al., | ) | CASE NO. 1:24-cv-01878-JPC |
| | ) | |
| Plaintiffs, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | |
| vs. | ) | **MEMORANDUM OF LAW IN** |
| | ) | **SUPPORT OF DEFENDANT** |
| | ) | **HEIDECORN, VETRANO AND** |
| ANDY LEFKOWITZ, et al., | ) | **LUKASIK'S MOTION FOR** |
| | ) | **JUDGMENT ON THE PLEADINGS** |
| Defendants. | ) | **AND/OR FOR MORE DEFINITE** |
| | | **STATEMENT** |

Pursuant to Federal Rules of Civil Procedure 12(b)(6), 12(c) and 12(e), and Local Rule for the District of Northern Ohio 7.1, Defendants David Heidecorn, Thomas Vetrano and Trisha Lukasik (collectively the "HVL Defendants") submit this memorandum of law in support of their Motion for Judgment on the Pleadings and/or for More Definite Statement.

Plaintiffs' Verified Complaint is long on hyperbole and deficient of actual facts to suggest – let alone state – a claim against the HVL Defendants, who are former members of the Locus Solutions, LLC ("Locus") Board of Managers (the "Board"). Plaintiffs, who are all accredited equity investors and/or unsecured creditors of Locus, have concocted defamatory claims against the HVL Defendants to try to recoup their risky investments in a start-up that ultimately could not generate enough revenue or raise additional capital to give Plaintiffs the return they had hoped for.

Specifically, Plaintiffs vaguely claim that the HVL Defendants violated federal and state securities laws and committed fraud without meeting the heightened pleading standard for these claims. There is no identification of the who, what, when, where and how of the allegedly fraudulent statements that allegedly caused them to invest in Locus. This is probably because had they done so, the Court would dismiss the claims because the allegedly fraudulent statements they

1

claim (i) were not made to them by the HVL Defendants in connection with a "purchase or sale of a covered security"; (ii) happened prior to the HVL Defendants joining the Board; and/or (iii) were made more than five years ago and therefore are barred by the five-year statute of repose for securities claims. The Court should dismiss the securities and fraud claims for failure to state a claim or, in the alternative, require Plaintiffs to make a more definite statement identifying the alleged fraudulent statement, when they were made, by whom and to whom they were made and the causal connection between the alleged fraud and Plaintiffs' loss of their investment in Locus.

Similarly, Plaintiffs do not allege how they have standing to pursue direct or derivative claims on behalf of Locus against the HVL Defendants. Where Plaintiffs fail in this most basic pleading requirement, the Court should dismiss the Complaint. At minimum, Plaintiffs must identify their standing to pursue direct and/or derivative claims.

Plaintiffs' breach of fiduciary duty claims fail for similar reasons. The Locus Operating Agreement, incorporated by reference into the complaint and attached to the Declaration of David Heidecorn ("Heidecorn Dec.") as **Exhibit A**, gives the Board full discretion to manage the company, excludes members from rights to manage the company, and protects the Board from liability unless they act in bad faith. Putting aside the spurious allegations concerning the Bridge Loan, which only involved Heidecorn, Plaintiffs nowhere identify how the HVL Defendants acted in bad faith towards Locus to benefit themselves. Indeed, the HVL Defendants were also all investors in Locus and would gain no benefit from breaching any duties to the company.

Plaintiffs next bring claims against the HVL Defendants under the Ohio limited liability company statute, claiming that they have a right to vote and right to company oversight of Locus. The Ohio LLC statute only applies, however, in the absence of controlling terms in the company's operating agreement. As set forth below, Locus's Operating Agreement gives full and complete

2

managerial discretion to the Board, not the members. The Ohio LLC statute does not give members more rights than the Operating Agreement. These claims must be dismissed.

Finally, Plaintiffs make a catch-all civil conspiracy claim among the Board members, Locus and Nuveen (a non-party) based on the same vague and conclusory allegations of fraud and breach of fiduciary duty. Plaintiffs also summarily conclude, with no supporting facts, that there was an agreement among the Board and the lenders "to commit such fraud upon the Plaintiffs and enrich themselves by extinguishing the value of the Plaintiffs' investments." (Compl. ¶175) (Doc # 1). Where Plaintiffs' underlying tort claims fail to state a claim, the civil conspiracy claim also fails.

## BACKGROUND

Locus is Organized in 2013

Locus is a "green technology company with the first patented technology that can cost-effectively manufacture and scale customized microorganisms and biosurfactants that outperform chemicals." (Compl. ¶30). Locus was founded by Andy Lefkowitz (who became its Chairman and CEO) and Sean Farmer (who became its Chief Scientific Officer). (¶31).

Locus was organized in Ohio on or about October 18, 2013. Articles of Organization, Heidecorn Dec., **Exhibit B**.[1] It was founded by Andy Lefkowitz and Sean Farmer. The original Operating Agreement for Locus Solutions, LLC was executed by Andy Lefkowitz, on or around September 30, 2014. **Exhibit A**. Pursuant to the Operating Agreement, Section 6, the management of Locus was delegated to the Board of Managers. Indeed, the Operating Agreement gave the Board "full and exclusive discretion," to "manage and control, have authority to obligate and bind,

---

[1]  The court may "consider documents that a defendant attaches to a motion to dismiss if the documents are referred to in the complaint and are central to Plaintiff's claims. . . In addition, the court may consider public records and matters of which a court may take judicial notice." Clark v. Walt Disney Co., 642 F. Supp. 2d 775, 782 (S.D. Ohio 2009).

and make all decisions affecting the Company and its business and assets." (§6.1(a), p. 6, §6.3).[2] The Operating Agreement required the Board to manage the affairs of Locus in a "prudent and businesslike manner" and in "good faith, in a manner the Manager reasonably believes to be in or not opposed to the best interests of the Company, and with the care that an ordinarily prudent person in similar position would use under similar circumstances." **Exhibit A**, §6.4(a), (c), pp. 8-9. The Operating Agreement also stated that "in carrying out the Manager's duties hereunder, no Manager shall be liable to the Company or to any Member for any actions taken in good faith and reasonably believed to be in or not opposed to the best interests of the Company, or for errors of judgment, neglect or omission." Id. §6.4(e), p. 9.[3] Finally, the Operating Agreement states: "Except as otherwise expressly provided in this Agreement, **no Member shall be entitled to participate in the control and management of the Company**[.]" Id. §6.5 (emphasis added).

In other words, per the Operating Agreement, the Board was charged with managing Locus in its exclusive discretion. So long as the Board acted in good faith and in a "prudent and businesslike manner," the managers have no liability for any business judgment decisions, even if they ended up being the wrong decisions. The Operating Agreement also specifically excluded Plaintiffs, as members and unsecured creditors, from any management of the company. Id.

---

[2] The Operating Agreement also set forth that the members of Locus granted the Board and its Managers "the power and authority to engage in the conduct" listed in specific sections of the former Ohio LLC statute, Chapter 1705, Section 1705.25. (§6.1(i), p. 8). As such, the Board was permitted to:

  (a) Assign the property of the company in trust for creditors or on the assignee's promise to pay the debts of the company;
  (b) Dispose of the good will of the business of the company;
  (c) Do any other act that would make it impossible to carry on the ordinary business of the company;
  (d) Confess a judgment;
  (e) Submit a claim or liability of the company to arbitration for reference.

Compare **Exhibit A** (§6.1(i), p. 8) with former Section 1705.25(A) (repealed).

[3] The Locus Solutions, LLC Operating Agreement was amended at various times, but the provisions cited herein did not substantively change.

Locus's original structure was to be the parent holding company for several subsidiaries, each of which would utilize Locus's patented technologies in different industries, e.g. energy and agriculture. (Compl., ¶39).

Plaintiffs' Investments in Locus

Plaintiffs are accredited equity investors and/or unsecured lenders of Locus and/or its subsidiaries (Locus Agriculture Holding, LLC and Locus Oil Holding, LLC). (Compl., ¶¶17-24). The HVL Defendants are also equity investors and/or noteholders of Locus and are in the same position as Plaintiffs with respect to those investments. Heidecorn Dec., ¶2; Vetrano Dec., ¶2; Lukasik Dec., ¶2. Accordingly, they too had an interest in Locus's success and no incentive to mismanage the company.

Plaintiffs conspicuously fail to include in the Complaint when they made their investments and/or made loans to the company, likely because many of these investments occurred over five years before the filing of the Complaint, some as early as 2014. Plaintiffs also fail to identify when and how the HVL Defendants made the allegedly false statements or material omissions to induce them to purchase a security interest in Locus. Heidecorn did not join the Board until 2018; Vetrano did not join the Board until January 2019; and Lukasik did not join the Board until December 2022. Heidecorn Dec., ¶1; Vetrano Dec., ¶1; Lukasik Dec., ¶1.[4] In other words, none of the HVL Defendants made any statements or omitted material information in communications to Plaintiffs that could have induced them to invest in Locus.

Locus Seeks New Financing Options in 2021

On or about November 2, 2021, Lefkowitz sent a memo to Plaintiffs and other investors

---

[4] While the Court cannot consider these additional facts in deciding the Motion to Dismiss, the HVL Defendants provide these facts for context as they highlight the speciousness of Plaintiffs' claims against the HVL Defendants.

that Locus was working with an investment bank, Nomura, on a potential merger of Locus with a publicly traded special purpose acquisition company ("SPAC") or to raise capital with a private equity firm. (Compl., ¶¶35-37). A copy of Lefkowitz November 2, 2021 memorandum, incorporated by reference into the Complaint, is attached to the Heidecorn Dec. as **Exhibit C**. As part of this effort, Lefkowitz stated that Locus needed to simplify its capital structure, which would entail converting equity interests in the subsidiary companies to equity interests in Locus, the parent holding company. (Compl., ¶39). Lefkowitz proposed that the equity holders execute Exchange Agreements to convert their interests in the subsidiary companies into interests in Locus. (¶41). The Exchange Agreements were contingent on specific triggering events, which never occurred. (¶¶41-42). Plaintiffs do not identify any specific misrepresentations in the November 2, 2021 memorandum, which mostly consist of forward-looking statements about Locus.

Instead, in the summer of 2022, Plaintiffs allege Lefkowitz told those who had entered into the Exchange Agreements that Locus's SPAC and private equity efforts had not worked out, but that the company was talking to an investment bank, the Jeffries Group ("Jeffries"), about obtaining a "much-needed loan." (Compl., ¶43). A copy of Lefkowitz's July 26, 2022 Investor Update, incorporated by reference into the complaint, is attached to the Heidecorn Dec. hereto as **Exhibit D**. Lefkowitz stated that Jeffries had offered to lend Locus $170 million for four years "based solely on our patent portfolio." Lefkowitz then outlined the conditions of the Jeffries loan, including that Jeffries must be put "in a senior position," necessitating changes in Locus's capital structure. In other words, the equity and noteholders would have to subordinate to the Jeffries loan. Notably, certain noteholders known as the payment-in-kind ("PIK") noteholders had the option, at this time, to cash out and be repaid the principal amount they invested plus all accrued interest or roll the notes subordinated to the Jeffries loan. Lefkowitz ended his overview with "our entire

management team is extremely anxious to put this financing in the rearview mirror and get back to putting our technology front and center where it belongs." Id.

Plaintiffs claim that in connection with the Jeffries Loan, Lefkowitz falsely promised to personally repay and/or find post-conversion buyers for the notes to induce those who were withholding consent for the conversion. (Compl., ¶44). Plaintiffs do not allege that the Board or Defendants made such promise, only Lefkowitz. Notwithstanding Lefkowitz's statement in his July 22 update that Jeffries was willing to lend money to Locus "based solely" on the IP, and that Locus was "very anxious" to obtain additional financing, Plaintiffs also allege that Lefkowitz failed to tell them that the company was in dire financial condition and that the only reason Jeffries was willing to lend money to Locus was because it would be secured by Locus's intellectual property and by an insurance policy. (¶44). Plaintiffs acknowledge that these omissions were not made in connection with their "purchase of a security" from Locus, but rather claim that had they known these facts, they would not have agreed to change the date of maturity of their notes or to shift their investments from the subsidiaries to Locus. (¶45). Plaintiffs, again, do not allege that the Defendants failed to disclose this information, only Lefkowitz. Plaintiffs also do not – because they cannot – allege that had they not agreed to extend the maturity date of their investments, that they would have recovered any of their investment from Locus. That is because, but for Jeffries, Locus would not have been able to continue operations and would have gone out of business.

Jeffries Uncovers Resume Fraud by Sean Farmer

During the due diligence for their loan to Locus, Jeffries uncovered resume fraud by Locus founder and Chief Scientific Officer, Sean Farmer, concerning his "scientific credentials." (Compl., ¶47). The Board "quietly" removed Farmer from the Board and as Chief Scientific Officers when Jeffries uncovered the discrepancies. (¶49). Plaintiffs assert that uncovering this

7

resume fraud caused Jeffries to reduce its final loan from $150 million to $117 million, along with other more onerous terms. (¶47). Plaintiffs claim that they relied on information regarding Farmer when they decided to invest in Locus (which likely pre-dated all of the HVL Defendants' tenure on the Board) and would not have invested with Locus without his "impressive track record." (¶50). Without any basis in fact, because it is in fact untrue, Plaintiffs also claim that they "suspect" that Locus and the Board knew Farmer was a fraud before it was uncovered by Jeffries and concealed such fraud from shareholders and potential investors.  (¶51).

The Jeffries IP Loan

In October 2022, Locus closed on the $117 million loan from Jeffries (the "IP Loan"). (Compl., ¶46). Plaintiffs claim this loan was the "beginning of the end" for Locus, as it "saddled" Locus with unaffordable debt based on onerous terms. (¶¶46-48). On the same day, Locus also entered into a separate loan with Jeffries ("Amendment 1") to cover prepaid interest and attorneys' fees from various law firms, of which Locus netted only a third of the principal. (¶¶57-59). Plaintiffs claim that Locus should have, but failed to give them notice of the terms of the IP Loan and Amendment 1 and failed to obtain the approval of Plaintiffs, as interest holders in Locus, which Plaintiffs assert is required by the Ohio LLC statute. (¶60). As set forth more fully below, the statute only applies in the absence of an operating agreement or if the operating agreement is silent as to certain powers and duties. The Locus Operating Agreement is very clear that the Board – not the members – were charged with managing the company and are also not liable for their decisions absent bad faith.

Locus Cannot Raise Additional Capital and Takes $4 Million Bridge Loan

According to Plaintiffs, the Board and Lefkowitz knew the IP Loan and Amendment 1 would not provide Locus with enough capital to operate beyond the end of 2023 but failed to

8

adequately pursue new financing in a timely manner. (Compl., ¶61). Then Plaintiffs claim that the Board and Lefkowitz actually did pursue new capital but were "laser-focused on a single prospective investor, the chemical company Solvay." (¶64). Solvay entered into a letter of intent with Locus, but ultimately decided in October 2023 not to proceed with the transaction. (¶64). Plaintiffs accuse the Board of "collective shortcomings and lack of any diligence," with respect to its efforts to find financing which left the Board with "no choice but to cobble together the Nuveen Loan (discussed below) with its 'expensive' financing and terms that doomed Locus." (¶66).

In November 2023, the Board learned that Locus needed immediate access to capital to make payroll or otherwise would have had to shutter operations. (Compl., ¶67). Locus was negotiating with Nuveen for a larger loan but needed immediate cash to continue paying salaries and other company expenses. As such, in a last-minute effort to save the company, and with no guarantee that the Nuveen loan would close, Heidecorn's investment vehicle, Colvin Capital, lent Locus $2.5 million, Jeffries lent Locus $1 million, and Lefkowitz lent Locus $500,000 (collectively the "Bridge Loan"). (¶¶68-71). Heidecorn recused himself from the Board's vote on the loan and did not negotiate its terms, but rather asked for whatever terms Jeffries negotiated for its $1 million loan. (Heidecorn Dec., ¶¶3-4). Plaintiffs claim that Heidecorn enriched himself at the expense of the company with the Bridge Loan. (Compl., ¶¶68-71). Plaintiffs also claim that Locus did not inform them of the Bridge Loan until February 2024 and never put the Bridge Loan to a shareholder vote, which they again claim was required by the Ohio LLC statute.  (¶73).

The Nuveen Financing

Plaintiffs claim that by letter dated December 28, 2023, Lefkowitz notified the PIK noteholders, some of whom were also members of Locus, that Locus had "major financial troubles" and that they were in negotiations with Nuveen for a loan. (Compl., ¶77). A true and

accurate copy of Lefkowitz's December 28, 2023 letter, incorporated by reference into the complaint is attached to the Heidecorn Dec. as **Exhibit E**. In the letter, Lefkowitz informed the note holders that Nuveen had conditionally agreed to defer all interest payments until after the Nuveen Loan matured, so long as a large majority of the PIK noteholders approved an amendment deferring all of their interest payments to maturity (as opposed to the then-current PIK loan terms of 7% cash interest and 9% PIK interest). (¶78). Plaintiffs claim that Lefkowitz's letter omitted the terms of the Nuveen loan, including the amounts charged by the banks and law firms and that Heidecorn rolled $700,000 of his interest earned on the Bridge Loan into Locus, "so that he could take advantage of and participate in the current restricting to the detriment of all of the other shareholders (including Plaintiffs)." (¶¶82-83). Again, Plaintiffs claim that Locus was required to give them notice and obtain approval of every shareholder prior to moving forward with the Nuveen Loan. (¶84). Plaintiffs claim they would not have agreed to move forward with Nuveen had Locus sought their approval. (¶90). Plaintiffs do not allege any facts to suggest that Locus would have or could have paid back Plaintiffs' investments had the Nuveen Loan not happened.

Locus Defaults on Nuveen Loan

Shortly after entering into the Nuveen Loan, Locus defaulted on certain financial covenants. Plaintiffs claim Locus had no chance of every complying with those covenants through August, when Locus could have received the additional $20 million Nuveen had pledged. (Compl., ¶86). Nuveen foreclosed on the loan and, at the time of the filing of the complaint, was in a restructuring process which Plaintiffs claim would cause them to lose their entire investment in Locus with no hope of repayment. Plaintiffs, as accredited investors, always understood this was a risk when investing in a start-up such as Locus. (¶¶94-96). The Board, at the direction of Nuveen, fired Lefkowitz as CEO in May 2024. (¶95). The HVL Defendants had declined compensation for

their work on the Board in mid-2023 and all resigned from the Board effective November 1, 2024. Heidecorn Dec, ¶¶6-7; Vetrano Dec., ¶¶3-4; Lukasik Dec., ¶¶3-4.

On August 26, 2024, Plaintiffs sent a demand to the HVL Defendants and Lefkowitz that they sue themselves for breach of fiduciary duty. (Compl., ¶98). The HVL Defendants responded through counsel disagreeing that any of the claims had merit and declining to bring suit against themselves. (¶99). Plaintiffs filed this complaint on October 28, 2024, more than two years after Plaintiffs admit that they were aware of harm and more than five years after Plaintiffs invested in Locus. In the caption and introductory paragraph of the Complaint, Plaintiffs state that certain of them are pursuing claims both individually and on behalf of Locus, and others are only asserting claims individually. The Complaint, however, does not contain facts to support Plaintiffs' standing and otherwise fails to differentiate between the individual and derivative allegations.

## ARGUMENT

### A. Standard of Law

To survive a Rule 12(c) or 12(b)(6) motion, a complaint must contain (a) "enough facts to state a claim to relief that is plausible on its face[,]" (2) more than "a formulaic recitation of a cause of action's elements[,]" and (3) allegations that suggest a "right to relief above a speculative level[.]" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007). In doing so, the District Court treats "[p]lausibly-pled facts as true," "[b]ut when a complaint pleads facts merely consistent with a defendant's liability, it is insufficient to state." Kolominsky v. Root, Inc., 100 F.4th 675, 682 (6th Cir. 2024) (internal quotations omitted). The Sixth Circuit, and the Northern District of Ohio, Eastern Division, may also order a more definite statement pursuant to Rule 12(e) where, as here, Rule 9(b) requires heightened pleading. Exal Corp. v. Roeslein & Assoc., Inc., No. 4:12-CV-01830, 2012 WL 4754748, at *4 (E.D. Ohio, Oct. 2, 2012) (Dowd, Jr., D.J.) ("Because Plaintiffs

complaint, in Count II, lacks the specificity required by Federal Rule of Civil Procedure 9(b), Defendant's Motion for a more definite statement is granted as to Count II.").

B. Counts I through IV Fail Because They are Not Plead with Sufficient Specificity

Counts I through IV, Plaintiffs' federal and state securities fraud and common law fraud claims, are all pled with insufficient specificity pursuant to Federal Rule of Civil Procedure 9(b) and, in the case of Count I, the Private Securities Litigation Reform Act ("PSLRA"). To succeed on these claims, Plaintiffs must allege that the HVL Defendants made misrepresentations to Plaintiffs "in connection with" the "purchase or sale of a covered security." See Chadbourne v. Parke LLP v. Troice, 571 U.S. 377, 382-83 (2014); Florida Carpenters Regional Counsel Pension Plan v. Eaton Corporation, 964 F. Supp. 2d 875, 885 (N.D. Ohio 2013) (Gaughan, J.). The Sixth Circuit applies the heightened pleading requirements of Rule 9(b) to securities fraud and common law fraud claims, requiring Plaintiffs to "(i) specify the statements that [they] contend[] were fraudulent, (ii) identify the speaker, (iii) state where and when the statements were made, and (iv) explain why the statements were fraudulent." Indiana State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc., 583 F.3d 935, 943 (6th Cir. 2009); see also Moran v. A/C Fin., Inc., No. 3:05-CV-00071, 2006 WL 8441932, at *8 (S.D. Ohio Aug. 29, 2006) (acknowledging state court's application of parallel Ohio Rule of Civil Procedure 9(b) to securities actions brought under Ohio Rev. Code Ann. § 1707). The PSLRA further requires Plaintiffs to (i) specify each statement alleged to have been misleading, with reasons why it is misleading, and (ii) state with particularity facts giving rise to the strong inference that the defendant(s) acted with the required state of mind. Frank v. Dana Corp., 547 F.3d 564, 570 (6th Cir. 2008). See also Greer v. Strange Honey Farm, LLC, 114 F.4th 605, 615-16 (6th Cir. 2024) ("Generally, Rule 9(b) requires that the plaintiff specify the who, what, when, where, and how of the alleged fraud. More

specifically, the complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, (4) explain why the statements were fraudulent. . . the complaint must describe the fraudulent scheme and the resulting injury." (internal quotation marks omitted)).

The Complaint is devoid of factual allegations to fulfill these specificity requirements as against the HVL Defendants. First, with regard to **who** made the allegedly fraudulent statements, the Complaint pins several specific communications upon Lefkowitz, but otherwise defaults to vaguely alleging misleading or deficient communications from the "Board." (E.g., Compl., ¶¶ 49, 54). No single, specific, allegedly fraudulent communication is attributed directly to Heidecorn, Vetrano, or Lukasik. Plaintiffs likely cannot pin any misrepresentations on the HVL Defendants to induce their investments, particularly where the HVL Defendants likely were not on the Board at the time.

Second, putting aside the communications Plaintiffs attribute to Lefkowitz, the Complaint also lacks any specificity with regard to **what** fraudulent statements were made, **how** they were made and **where** they were made. Instead, the Complaint makes sweeping and vague references to "quarterly updates, personal conversations, emails, investor marketing materials, and memoranda[.]" (E.g., ¶¶ 104, 106-108, 112, 114-116, 121, 123-125). This is again insufficient to satisfy the heightened pleading standards required for Counts I-IV. Moreover, these statements, on their face, were made to Plaintiffs as investors, not prospective investors. Accordingly, they cannot be the basis of Plaintiffs' Counts I through IV.

Third, and most egregious, is the lack of any detail in the Complaint as to **when** the fraudulent statements were made by the HVL Defendants to Plaintiffs to induce their investments in Locus. This is important because claims under Section 10(b) and Rule 10b-5 must be brought

no later than (a) two (2) years after the discovery of facts constituting the violation, or (b) five (5) years after the violation, whichever ends earlier. 28 U.S.C. § 1658(b).  Similarly, Sections 1707.41 and 1707.43 of the Ohio Rev. Code, prohibit actions past two years of plaintiffs knowing, or having reason to know, of their claim, or more than five (5) years past the purchase of the securities at issue, whichever is shorter. Accordingly, Counts I, II, and III are all subject to a two (2) year statute of limitations and a five (5) year statute of repose. 28 U.S.C. § 1658(b); Ohio Rev. Code Ann. §§ 1707.41(D), 1707.43(B).[5]

Here, the Complaint does not identify any facts to suggest **when** Plaintiffs made their investments in Locus, let alone **when** the HVL Defendants allegedly made fraudulent statements to Plaintiffs to induce their investment. Indeed, the only misrepresentation Plaintiffs claim was made to them to induce their investments in Locus was with regard to Sean Farmer's scientific credentials. (Compl., ¶50). Plaintiffs conspicuously fail to identify **when** the statements about Farmer were made to them and **when** they made their investments in reliance on the statements, likely because they occurred before October 28, 2019, which is the date the statute of repose cuts off Plaintiffs' securities claims. All of Plaintiffs' other allegations of misrepresentations and/or non-disclosures occurred **after** Plaintiffs already invested in Locus and are not "in connection with" a purchase or sale of a security, and therefore is not actionable under the federal or state securities laws. (Compl., ¶¶ 17-24).

Fourth, the Complaint does not sufficiently allege scienter. Scienter is a required element of a securities fraud claims, and must clear a similarly high hurdle in pleading: The Complaint must create a "strong inference," which amounts to "more than merely 'reasonable' or

---

[5] "[I]f a complaint alleging common-law fraud is predicated on the sale of securities, the applicable statute of limitations is found in R.C. 1707.43, not R.C. 2305.09." <u>Goldberg v. Cohen</u>, 2002-Ohio-3012, ¶ 13.

'permissible' – it must be cogent and compelling" and "strong in light of other expectations" such that "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, LTD, 551 U.S. 308, 322-24 (2007).[6]

Here, putting aside the Bridge Loan[7], the Complaint alleges no facts, just broad generalizations and conclusions, to suggest the HVL Defendants were acting to enrich themselves over other shareholders. On the contrary, and as previously stated, the HVL Defendants were all themselves invested in Locus, stood to lose if the Board's business decisions failed, stopped taking a Board fee for their work on the Board in 2023 and resigned from the Board effective November 1, 2024. (Heidecorn Dec, ¶¶2, 6-7; Vetrano Dec., ¶¶2-4; Lukasik Dec., ¶¶2-4). The HVL Defendants are in no better position than Plaintiffs with regard to their investments. Accordingly, the far more compelling inference from the facts alleged in the Complaint is that the HVL Defendants, as members of the Board, made a series of business decisions with the short-term goal of keeping Locus's lights on, and which, in hindsight, disappointed Plaintiffs. These claims fail.

_____

[6] The Sixth Circuit looks for evidence of scienter using nine non-exhaustive factors which include: (i) insider trading at a suspicious time or in an unusual amount; (ii) divergence between internal reports and external statements on the same subject; (iii) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (iv) evidence of bribery by a top company official; (v) existence of ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (vi) disregard of the most current factual information before making statements; (vii) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (viii) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (ix) the self-interested motivation of defendants in the form of saving their salaries or jobs. City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus, Inc., 29 F.4th 802, 813 (6th Cir. 2022). No allegations of these types of scenarios exist in the Complaint.

[7] The Bridge Loan was a risky short-term investment, which Heidecorn participated in as a last-ditch effort to keep Locus operating and making payroll until Locus secured other funding. Heidecorn recused himself from negotiations and the Board vote and only took what Jeffries had negotiated for its share of the Bridge Loan. Heidecorn Dec, ¶¶3-4. The HVL Defendants cannot be charged with bad faith where they believed the Bridge Loan was in the best interests of Locus.

C. Plaintiffs Fail to Plead Facts Sufficient to Establish Standing to Pursue Individual and Derivative Claims

Plaintiffs have not asserted facts to establish their standing to pursue individual or derivative claims against the HVL Defendants. For a member of an LLC to maintain a derivative action on behalf of the LLC, in relevant part, the member must fairly and adequately represent the interests of the LLC in enforcing its rights and must have been a member at the time of the act or omission of which the member complains. Ohio Rev. Code Ann., § 1706.611. "'Where the defendant's wrongdoing has caused direct damage to the corporate worth, the cause of action accrues to the corporation, not to the shareholders....'" Joseph v. Joseph, No. 19-3350, 2022 WL 3536273, at *9 (6th Cir. Aug. 18, 2022) (quoting Adair v. Wozniak, 492 N.E.2d 426, 429 (Ohio 1986)). "Shareholders may only bring direct suit when they have been directly injured, not when they are seeking redress for injury done to the corporation." Maloof v. BT Com. Corp., 261 F. App'x 887, 889 (6th Cir. 2008) (citing Crosby v. Beam, 548 N.E.2d 217, 219 (Ohio 1989)).

Here, while Plaintiffs vaguely allege that they were either unitholders and/or noteholders in Locus during the relative timeframes (Compl., ¶¶ 17-24), they do not plead actual facts to suggest when they first obtained membership interests in Locus, how much they invested or why they can fairly and adequately represent the members of Locus in this case. Plaintiffs also vaguely allege that certain Plaintiffs are pursuing both direct and derivative claims against the HVL Defendants, without ever identifying which Plaintiff is asserting which claims except in the caption.[8] The essence of Plaintiffs' allegations, however, is that the defendants mismanaged Locus and agreed to bad loans, which are injuries to Locus, not to Plaintiffs, individually. Accordingly, while Plaintiffs fail to plead facts to suggest standing to pursue derivative claims, any claims

---

[8] Only members would potentially have standing to pursue derivative claims on behalf of Locus. It is unclear what, if any claims, the non-member noteholders, as unsecured creditors, are asserting against the HVL Defendants.

16

asserted by Plaintiffs individually also fail as a matter of law. At minimum, Plaintiffs should have to identify which Plaintiffs are bringing which claims and their factual basis for standing.

D. <u>Counts V and VI Fail Because the Complaint Does Not Allege Bad Faith as to the HVL Defendants</u>.

Counts V and VI, presenting two separate flavors of breach of fiduciary duty, fail for the same reason – the HVL Defendants' good faith fulfillment of duties as defined by Locus's Operating Agreement. "[I]n order to prove a breach of fiduciary duty claim, the plaintiff must establish (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom." <u>Akerstrom v. 635 W. Lakeside, Ltd.</u>, 105 N.E.3d 440, 446 (Ohio Ct. App. 2018) (citation omitted). As described, Locus's applicable Operating Agreement defines the Board's duties, and liabilities arising therefrom, in terms of the Board's good faith to the company: "[I]n carrying out the Manager's duties hereunder, **no Manager shall be liable to the Company or to any Member for any actions taken in good faith and reasonably believed to be in or not opposed to the best interests of the Company, or for errors of judgment, neglect or omission**." **Exhibit A**, §6.4(a) and (c), pp. 8-9) (emphasis added). This is consistent with Ohio's LLC Statute, which specifically permits an operating agreement to limit, or eliminate, liabilities for breach of duties, including fiduciary duties, so long as that breach was not made in bad faith or in offense of the implied covenant of good faith and fair dealing. <u>See</u> Ohio Rev. Code Ann. § 1706.08(B)(2).

The Complaint, at most, alleges Plaintiffs' disappointment with the financing decisions of the HVL Defendants on behalf of Locus. (Compl., ¶¶46-48, 58-59). Absent are any facts to suggest that the HVL Defendants acted in bad faith or even had other options that would have allowed Locus to keep operating and Plaintiffs to recover their investments. The HVL Defendants made the decisions necessary to keep Locus operating in the short term, which the Complaint

acknowledges they were successful in doing. (Compl., ¶¶67-68). Heidecorn's involvement in the Bridge Loan is not to the contrary – he recused himself from the Board vote on the loan as well as all negotiations on behalf of both the Board and Colvin Capital, and provided Locus with the funding it needed to stay in operation. (Compl. ¶¶ 67-68; Heidecorn Dec, ¶¶3-5). Plaintiffs have not identified or alleged any authority in the Operating Agreement requiring Locus's Board to contemporaneously inform all members of the terms of a contemplated loan to the company, or the right to vote on that loan, as no such duty exists. **Exhibit A**, §6.5, p. 9. The HVL Defendants acted consistent with their obligations under the Operating Agreement, and indeed in the way they believed was necessary to keep Locus operating for the benefit of the company. These claims fail.

E. Counts VII and VIII Fail According to the Terms of Locus's Operating Agreement.

Counts VII and VIII, which generally claim rights of Locus's members to participate in its governance, both fail by virtue of Locus's Operating Agreement. Plaintiffs ground both counts in Ohio's LLC statute, Section 1706.62 specifically. (Compl., ¶¶ 154-170). Ohio's LLC statute, however, merely provides default rules for Ohio LLCs in the absence of an operating agreement or where an operating agreement is silent on a material term. See Ohio Rev. Code Ann. §1706.08(A) (the LLC "operating agreement governs the relations among the members as members and between the members of the limited liability company" and the LLC statute only fills in to the extent the operating agreement "does not otherwise provide for a matter."). Indeed, Section 1706.08(C) identifies only a limited list of items an LLC operating agreement cannot do, none of which are relevant to this case.

Accordingly, Locus's Operating Agreement governs Plaintiffs relations with the HVL Defendants and with Locus, not the Ohio LLC statute. The Operating Agreement delegates all management duties and functions to the Board. **Exhibit A**, §6.1(a), p. 6, §6.3 (giving Locus's

Board "full and exclusive discretion," to "manage and control, have authority to obligate and bind, and make all decisions affecting the Company and its business and assets"). The Operating Agreement protects the Board's decisions so long as the Managers act in good faith. Id. §6.4(e), p. 9. Finally, the Operating Agreement does not provide Plaintiffs, as members, any managerial authority of Locus. Id., §6.5, p. 9. In short, Counts VII and VIII attempt, and fail, to invoke default statutory rights and protections for members of an LLC which Locus's Operating Agreement, **consistent with the LLC statute**, lawfully overrides. These claims must be dismissed.

      F.   Count IX Fails for Lack of Any Underlying Tort.

"To establish a claim of civil conspiracy, a plaintiff must prove: (1) a malicious combination; (2) involving two or more persons; (3) causing injury to person or property; and (4) the existence of an unlawful act independent from the conspiracy itself." Dale v. Selene Finance LP, No. 3:15-CV-01762, 2016 WL 1170772, at *12 (N.D. Ohio Mar. 25, 2016) (Carr, J). As described herein, Plaintiffs cannot state a claim for an underlying tort. See Sections II.B-F supra. Plaintiffs have also failed to allege that the HVL Defendants engaged in "unlawful act independent from the conspiracy itself." Accordingly, Plaintiffs' civil conspiracy claim also fails. Dale, 2016 WL 1170772, at *12 ("For the reasons set forth above, Dale has not alleged a plausible fraud claim. Accordingly, his claim that defendants conspired to foreclose on his home without the right to do so likewise fails.").

## CONCLUSION

For the foregoing reasons, the HVL Defendants respectfully request that this honorable Court GRANT their Motion and DISMISS the Complaint, with prejudice, as to all claims against them, or in the alternative, ORDER Plaintiffs to amend their Complaint to articulate their claims more definitely as described herein.

Date: January 31, 2025   Respectfully submitted,

*/s/ Kevin M. Norchi*

_____

KEVIN M. NORCHI (OH Bar No. 0034659)
**FREEMAN MATHIS & GARY, LLP**
3201 Enterprise Parkway, Suite 190
Cleveland, OH 44122
Telephone: (216) 329-4875
Facsimile: (888) 356-3596
E-mail:  kevin.norchi@fmglaw.com

-and-

A. NEIL HARTZELL (MA Bar No. 544752)
**FREEMAN MATHIS & GARY, LLP**
60 State Street, Suite 600
Boston, MA 02109-1800
Telephone: (617) 963-5966
E-mail:  neil.hartzell@fmglaw.com
*Pro Hac Vice*

-and-

JESSICA GRAY KELLY (MA Bar No. 666846)
**FREEMAN MATHIS & GARY, LLP**
60 State Street, Suite 600
Boston, MA 02109-1800
Telephone: (617) 807-8953
E-mail:  jessica.kelly@fmglaw.com
*Pro Hac Vice*

*Attorneys for Defendants*
*David Heidecorn, Trisha Lukasik, and Thomas Vetrano*

20

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of January, 2025, the foregoing Memorandum of Law was filed via the Court's electronic filing system (NextGen CM/ECF), which will send electronic notification of such filing to all parties represented by attorneys who are registered NextGen CM/ECF users.

/s/ Kevin M. Norchi

_____

Kevin M. Norchi
*One of the Attorneys for Defendants*
*David Heidecorn, Trisha Lukasik, and Thomas*
*Vetrano*