# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| BLUE OCEAN LEGACY TRUST, *et al.*, | ) ) ) | Case No. 1:24-cv-01878 |
| | ) | Judge J. Philip Calabrese |
| Plaintiffs, | ) ) | |
| | ) | Magistrate Judge |
| v. | ) | Jonathan D. Greenberg |
| | ) | |
| ANDY LEFKOWITZ, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION AND ORDER

Investors and lenders of Locus Solutions, LLC bring this action against the company and members of its officers and directors seeking to recover damages for its alleged failure to disclose information about résumé fraud, dire financial conditions, loan terms, and a purported conspiracy to takeover the company.  Plaintiffs bring claims for violation of the federal Securities Exchange Act, Ohio securities fraud, common-law fraud, breach of fiduciary duties, and civil conspiracy, as well as their right to vote and right to company oversight.  The individual Defendants move for judgment on the pleadings in two separate motions.

## STATEMENT OF FACTS

On Defendants' motions for judgment on the pleadings, the verified complaint alleges the following facts, which the Court accepts as true and construes in the light most favorable to Plaintiffs as the non-moving parties, as it must in the present procedural posture.  On a motion under Rule 12(c), the Court's inquiry is limited to

the content of the complaint, although it may also consider matters of public record, items appearing in the record of the case, and exhibits attached to or made part of the pleadings. *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001). "While documents integral to the complaint may be relied on, even if they are not attached or incorporated by reference, it must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Mediacom Se. LLC v. BellSouth Telecomms., Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) (cleaned up).

Here, Defendants attach a number of documents to their motions. Generally, these attachments consist of various corporate documents for Locus Solutions and statements from Mr. Lefkowitz at different times. (*See* ECF No. 21-1, PageID #168.) Although the former are not directly referenced in the complaint, they provide some limited additional helpful background, and the documents are not reasonably subject to dispute. As for the latter, these documents are directly at issue in the case, and Plaintiffs do not object to their consideration. (ECF No. 28, PageID #286–87.) For these reasons, the Court considers these attachments as part of the pleadings for purposes of Defendants' motions, references them where appropriate, and does not convert the motions to ones for summary judgment.

### A.    Locus Solutions

Locus Solutions, LLC is an Ohio green technology company founded in 2014 that possesses "the first patented technology that can cost-effectively manufacture and scale customized microorganisms and biosurfactants that outperform chemicals." (ECF No. 1, ¶¶ 2 & 29–30, PageID #2 & #8.) Andrew Lefkowitz and Sean Farmer

founded the company, with the former serving as its chairman and chief executive officer and the latter acting as its chief scientific officer.  (*Id.*, ¶ 31, PageID #8.)

The company's operating agreement provides that, "[e]xcept as otherwise expressly provided in this Agreement, no Member shall be entitled to participate in the control and management of the Company."  (ECF No. 21-1, § 6.5, PageID #182.) That function fell to the board.  (*Id.*, § 6.4, PageID #181–82.)

Locus Solutions represented that Mr. Lefkowitz had experience "building multiple microbial-based businesses" and that Mr. Farmer "had numerous degrees from prestigious universities" and invented a leading probiotic found in "over 1,000 products across 60 countries."  (*Id.*)  As of May 2023, Locus Solutions had over 160 employees in 11 offices across five States.  (ECF No. 1, ¶ 32, PageID #8.)

As with many companies today, intellectual property was the "most valuable asset" of Locus Solutions.  (*Id.*, ¶ 33.)  The company filed over 1,600 patent applications, and in 2022 its intellectual property portfolio was valued at over $500 million.  (*Id.*)  Locus Solutions allegedly informed its investors that it had a contract with Dow Chemical for the supply of certain biosurfactants, which it claims would generate $165 million in revenue and $85 million in earnings before interest, taxes, depreciation, and amortization in 2026.  (*Id.*, ¶ 34.)

## B.    Efforts to Raise Capital

Plaintiffs are accredited equity investors, unsecured lenders of Locus Solutions, or both.  (*Id.*, ¶¶ 17–24, PageID #6–7.)  Plaintiffs do not indicate when they invested in Locus Solutions but claim that they were unitholders during the relevant time period.  (*Id.*)  On November 2, 2021, Mr. Lefkowitz sent a memorandum to the

3

shareholders (also known as members) and convertible noteholders representing that Locus Solutions was working with Nomura Greentech, an investment banker, on a merger "with a publicly traded special purpose acquisition company" or, alternatively, raising capital from a private equity firm. (*Id.*, ¶¶ 36–37, PageID #9; *see also* ECF No. 21-1, PageID #212.) To effectuate either transaction, Mr. Lefkowitz represented that the shareholders and convertible noteholders of Locus Solutions would have to be converted into shareholders of its holding company, which Plaintiffs claim "marked a departure from the company's original operating structure." (ECF No. 1, ¶¶ 38–39, PageID #9.) Plaintiffs allege that the board of Locus Solutions did not disclose the actual purpose behind the conversion, which had the effect of permitting the company to "put at risk its most valuable intellectual property and wipe out any value of the shares and convertible notes." (*Id.*, ¶ 40.)

### B.1.  Exchange Agreements

Also in November 2021, several shareholders of Locus Agriculture Solutions and convertible promissory noteholders of Locus Bio-Energy, who are Plaintiffs, agreed to exchange agreements to effectuate the conversion of their investments, contingent on certain triggering events. (*Id.*, ¶ 41, PageID #9–10.) By the summer of 2022, the triggering events had not occurred, and Mr. Lefkowitz and the board turned instead to borrowing money. (*Id.*, ¶ 42, PageID #10.) Around that time, Mr. Lefkowitz informed the shareholders who agreed to exchange agreements that the company was in discussions with a broker, the Jefferies Group, to obtain a loan. (*Id.*, ¶ 43.) Therefore, Mr. Lefkowitz informed the shareholders that, to complete the conversion of their interests into shares of the holding company, they had to agree to

4

a consent and amendment to the exchange agreement.  (*Id.*; *see also* ECF No. 21-1, PageID #217.)  This investor update advised that the Jeffries Group offered to lend the company $170 million "for four years, based solely on our patent portfolio."  (ECF No. 21-1, PageID #218.)

Plaintiffs allege that Mr. Lefkowitz "falsely promised to personally repay and/or find post-conversion buyers for the notes to induce those who were withholding consent for the conversion."  (ECF No. 1, ¶ 44, PageID #10.)  Further, Plaintiffs claim that Mr. Lefkowitz did not inform them that "the company was in dire financial condition" and that the loan was (1) secured by the company's "most valuable intellectual property"; (2) "secured further by an insurance policy"; and (3) "called for draconian interest reserves and fees."  (*Id.*)  Plaintiffs allege that, had they known about these details of the loan, they would not have agreed to the conversion.  (*Id.*, ¶ 45.)

### B.2.   The Jefferies Group Loans

In October 2022, Locus Solutions and Jefferies Group closed a loan for $117 million, which Plaintiffs claim saddled the company "with unaffordable debt" and was secured by its intellectual property.  (*Id.*, ¶¶ 46–47, PageID #11.)  Plaintiffs allege that the Jefferies Group discovered that Mr. Farmer had committed résumé fraud regarding his scientific credentials, causing it to reduce the loan amount from $150 million to $117 million, increase the interest rate, and require "costly insurance."  (*Id.*, ¶ 47.)  Plaintiffs claim that the company netted just $63 million for the loan and that its costs roughly equaled this amount.  (*Id.*, ¶¶ 47–48.)  These costs included pre-payment of interest for two years (over $30 million), an escrow over $15

5

million to cover two-and-a-half years of insurance premiums, and over $18 million in fees.  (*Id.*, ¶ 48.)

Neither Mr. Lefkowitz nor the board allegedly disclosed to shareholders details about Mr. Farmer's alleged fraud, Mr. Farmer's removal from the board and demotion to a contract research scientist, or how this affected the loan.  (*Id.*, ¶¶ 49–50.) Plaintiffs claim that they would not have invested in Locus Solutions or believed that the company would succeed without Mr. Farmer's allegedly fraudulent credentials. (*Id.*, ¶ 50, PageID #11–12.)  Plaintiffs allege that the company and the board either failed to discover the fraud with due diligence or concealed the information from shareholders.  (*Id.*, ¶ 51, PageID #12.)

Further, Plaintiffs claim that Mr. Lefkowitz and the board concealed from shareholders that the loan was only a temporary, "short-term financing solution," which would not keep "the company afloat for much longer than a year," and that Mr. Lefkowitz told investors that the loan was the "financial equivalent of the Good Housekeeping Seal of Approval."  (*Id.*, ¶ 53.)  Mr. Lefkowitz and the board allegedly failed to disclose to shareholders that the loan granted the lender a security interest in the company's patent portfolio until "well after the IP Loan closed."  (*Id.*, ¶ 54.)  In addition, Locus Solutions allegedly did not obtain the approval of every shareholder for the loan.  (*Id.*, ¶ 55, PageID #13.)

Also, in October 2022, Locus Solutions and Jefferies Group closed another loan, referred to as "Amendment #1," which the company allegedly did not disclose to the shareholders and for which the company did not obtain approval from any

6

shareholder.  (*Id.*, ¶¶ 57 & 60.)  The principal amount of this loan was $11,605,000, but Plaintiffs claim that the company only netted $2,970,204 of the proceeds.  (*Id.*, ¶ 58.)  Further, Locus Solutions allegedly prepaid $8,505,000 in interest and $130,000 in legal fees.  (*Id.*, ¶ 59.)

Locus Solutions represented that it began discussions with Jefferies Group regarding funding "as soon as" the loan closed in October 2022.  (*Id.*, ¶ 62, PageID #14.)  However, Plaintiffs claim that the company did not reach out to institutional investors regarding equity capital until April 2023 and did not officially hire a broker to raise funding until May 3, 2023.  (*Id.*, ¶¶ 62–63.)  Mr. Lefkowitz and the board entered into a letter of intent with the chemical company Solvay for a $150 million equity investment.  (*Id.*, ¶ 64.)  But in October 2023, Solvay decided not to proceed with the transaction after doing due diligence.  (*Id.*)  Plaintiffs claim that, because the board only focused on Solvay as the sole bidder, the company was left with no backup plan.  (*Id.*, ¶ 65.)  According to Plaintiffs, Locus Solutions would have not been able to make payroll and would have to close its operations if it did not receive funding, which was not disclosed to the investors.  (*Id.*, ¶ 67, PageID #14–15.)

### B.3.  The Short-Term Loan

On November 30, 2023, David Heidecorn, a member of the board of managers of Locus Solutions, as well as Mr. Lefkowitz and the Jefferies Group, lent the company $4 million as a bridge loan.  (*Id.*, ¶¶ 26 & 68, PageID #7 & #15.)  According to Plaintiffs, the company received a net amount of $3,150,950.  (*Id.*, ¶ 68, PageID #15.)  Of that amount, Mr. Heidecorn allegedly put up $2.5 million and charged Locus Solutions an upfront fee of $100,000, as well as what Plaintiffs allege

7

was an "extremely high interest rate (effectively 355% annually)," resulting in $1.7 million in profits to him for a two-month loan.  (*Id.*, ¶ 69.)  The Jefferies Group lent $1 million, with a $214,375 arranger fee and $40,000 upfront fee.  (*Id.*, ¶ 70.) Mr. Lefkowitz put up $500,000 without fees.  (*Id.*, ¶ 71.)  Plaintiffs claim that Locus Solutions "inexplicably racked up large legal bills from four law firms" in the amount of $437,175 and a US Bank charge of $57,500.  (*Id.*, ¶ 72.)  Plaintiffs allege that the company did not timely inform the shareholders of these details or put the bridge loan to a shareholder vote, and the shareholders did not find out about the short-term loans until February 2024.  (*Id.*, ¶¶ 73–74, PageID #15–16.)  Even then, Mr. Heidecorn's involvement remained undisclosed.  (*Id.*, ¶ 73, PageID #16.)

### B.4.  The Nuveen Loan

In December 2023, the board was working to finalize the terms of a $50 million loan from Nuveen as the primary lender.  (*Id.*, ¶ 76.)  On December 28, 2023, Mr. Lefkowitz corresponded with payment in kind ("PIK") noteholders and shareholders informing them, allegedly for the first time, that the company had "major financial troubles" and that the company was in negotiations with Nuveen for a loan.  (*Id.*, ¶ 77; *see also* ECF No. 21-1, PageID #229.)  Mr. Lefkowitz told the PIK noteholders that Nuveen agreed to defer interest payments until after the loan matured, but that this condition depended on agreement from a majority of outstanding PIK noteholders to defer their interest payments to maturity and that the company "would increase the PIK interest rate from 16% to 20%."  (ECF No. 1, ¶ 78, PageID #16.)

According to Plaintiffs, Mr. Lefkowitz did not share the details about Mr. Farmer's alleged fraud, the revenue covenant in the Nuveen loan, the facts that the company allegedly netted roughly half of the face amount of the loan, and that the $50 million loan "would be backed by [the company's] intellectual property."  (*Id.*, ¶ 79, PageID #16–17.)  Once Locus Solutions entered into the loan, Mr. Lefkowitz allegedly told the shareholders that they "ha[d] never been in a better position to enhance [their] revenue, and [their] ultimate valuation."  (*Id.*, ¶ 85, PageID #16.)

The Nuveen loan provided for $30 million of funding in January 2024 and $20 million of funding in August 2024.  (*Id.*, ¶ 80, PageID #17.)  Plaintiffs claim that Locus Solutions netted only $20,606,628 of the principal, the Jefferies Group took a $2.1 million advisory fee and a $250,000 fronting fee, six law firms received $1,615,632 in fees, $900,000 in fees went to Pan American Finance, and US Bank received $19,000 in fees.  (*Id.*, ¶ 81.)  The Nuveen loan proceeds were used in part to repay the bridge loan lenders, two of which Plaintiffs allege "were company insiders."  (*Id.*, ¶ 82.)  Further, Mr. Heidecorn allegedly had the board repay him $4.1 million for the $2.5 million loan and profited "roughly 68% in two months."  (*Id.*, ¶ 82.)  In addition, Mr. Heidecorn lent $700,000 of the bridge loan profit back to Locus Solutions.  (*Id.*, ¶ 83, PageID #18.)  The Jefferies Group was repaid $641,941 and also lent that amount back to the company.  (*Id.*)

In short, Plaintiffs claim that Mr. Heidecorn and the Jefferies Group participated in the restructuring of the company to the detriment of the shareholders.

(*Id.*)  The board allegedly did not seek or obtain shareholder approval before going forward with the Nuveen loan.  (*Id.*, ¶ 84.)

### C.     Default

According to Plaintiffs, Locus Solutions defaulted on financial covenants in the Nuveen loan shortly after entering into it, and the company "had no chance of ever complying with those covenants and lasting until August, when it could receive the additional $20 million Nuveen had pledged."  (*Id.*, ¶ 86.)  Plaintiffs claim that the company did not inform the shareholders and PIK noteholders about the allegedly unreasonable terms of the loan and the financial covenants.  (*Id.*, ¶¶ 86 & 92, PageID #18–19.)   Further, Plaintiffs allege that, had the shareholders and PIK noteholders been informed of the terms and covenants, they would not have approved the loan. (*Id.*, ¶¶ 90 & 93.)

### D.     The Takeover

Nuveen allegedly negotiated with AON to buy its security interest in the defaulted loan, which gave Nuveen, Mr. Heidecorn, and the Jefferies Group "nearly total control over the company." (*Id.*, ¶ 94, PageID #19.)  Plaintiffs claim that this was part of the conspiracy to take over the company.  (*Id.*)

In May 2024, the lenders of the Nuveen loan directed the board to terminate Mr. Lefkowitz as chief executive officer of Locus Solutions and appointed Joe Concannon of FTI Consulting as interim CEO.  (*Id.*, ¶ 95.)  According to Plaintiffs, the board and Nuveen are nearly finished with a restructuring transaction that will cause Plaintiffs to lose their investment "with no hope of repayment" and that debt

forgiveness for the company would have significant negative tax consequences for Plaintiffs.  (*Id.*, ¶¶ 96–97.)

### E.  The Board's Refusal to File Suit

On August 26, 2024, Plaintiffs sent a letter to the board of managers, including Mr. Heidecorn, Mr. Lefkowitz, Thomas Vetrano, and Trisha Lukasik, demanding that they file breach of fiduciary duty claims against themselves and other non-independent directors who served on the board and advising that Plaintiffs would file derivative claims if they did not do so.  (*Id.*, ¶ 98, PageID #19–20.)  The board of managers responded by letter on September 9, 2024, informing Plaintiffs that it did not agree that the claims had merit and declined to file them.  (*Id.*, ¶ 99, PageID #20.)  According to Plaintiffs, Mr. Lefkowitz has not yet formally responded.  (*Id.*, ¶ 100.)

### STATEMENT OF THE CASE

Based on these events, Plaintiffs filed suit against Defendants Andy Lefkowitz, David Heidecorn, Thomas Vetrano, Trisha Lukasik, and Locus Solutions (as a nominal Defendant) on October 28, 2024.  (*Id.*)  Mr. Lefkowitz served as the chief executive officer and was on the board of Locus Solutions.  (*Id.*, ¶ 25, PageID #7.)  The other individual Defendants served on the board of the company.  (*Id.*, ¶¶ 26–28.)  Plaintiffs bring claims for violation of the federal Securities Exchange Act (Count I); Ohio securities fraud (Counts II and III); common-law fraud (Count IV); breach of fiduciary duties (Counts V and VI); right to vote (Count VII); right to company oversight (Count VIII); and civil conspiracy (Count IX).  (*Id.*, ¶¶ 102–79, PageID #20–40.)

11

Mr. Lefkowitz moves for judgment on the pleadings and, in the alternative, for a more definite statement regarding Plaintiffs' fraud claims. (ECF No. 27.) In a separate motion, the remaining individual Defendants (sometimes referred to as the HVL Defendants) do so as well. (ECF No. 21.) Also, Mr. Lefkowitz moves to deem his reply timely. (ECF No. 35.) In doing so, Mr. Lefkowitz states that the brief was filed five minutes late due to technical difficulties. (*Id.*, PageID #339.) Plaintiffs do not oppose the motion. Because there is no prejudice, and without objection, the Court **GRANTS** Mr. Lefkowitz's motion (ECF No. 35), deems the reply timely, and gives it due consideration in ruling on the pending motions.

## ANALYSIS

Ordinarily, three different pleading standards apply to the various counts in the complaint: (1) Rule 8's familiar notice-pleading standard; (2) Rule 9(b)'s heightened standard for pleading fraud; and (3) the standard in the Private Securities Litigation Reform Act. *See Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, 556 F. Supp. 3d 772, 782–83 (N.D. Ohio 2021), *aff'd*, No. 21-3863, 2022 WL 3972478 (6th Cir. 2022). First, however, the Court must determine whether Plaintiffs state a claim for securities fraud under Section 10(b) and Rule 10b-5, which does not require application of these various pleading standards. That is, the Court must consider whether Plaintiffs have a cause of action under the statute. *Lexmark Int'l, Inc. v. Static Control Components*, 572 U.S. 118, 128 (2014).

## I.    Securities Fraud in Violation of Section 10(b) & Rule 10b-5 (Count I)

Defendants argue that Plaintiffs fail to state a claim for securities fraud because they do not plead that the misrepresentations or omissions about which they

12

complain were made in connection with the purchase or sale of a security. (ECF No. 21, PageID #157–59; ECF No. 27, PageID #271.) Instead, Defendants contend that the alleged misrepresentations or omissions at issue occurred "long after" Plaintiffs' initial investments in Locus Solutions. (ECF No. 21, PageID #311.) Plaintiffs concede that the alleged misrepresentations or omissions are not connected to their purchase or sale of a security. (ECF No. 28, PageID #288–89.) They argue that the change in the nature of their investments, attributable to Defendants' fraud, amount to a "purchase" of a new security for the purpose of this requirement. (*Id.*) Specifically, they point to changes in the date of maturity of their notes and movement of their investments from the operating company to its holding company. (*Id.*)

### I.A. Private Cause of Action

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest for the protection of investors." 15 U.S.C. § 78j(b). To enforce this statute, the SEC promulgated Rule 10b-5, which makes it "unlawful to, among other things, 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 17 C.F.R. § 240.10b-5(b)).

"The scope of Rule 10b-5 is coextensive with the coverage of § 10(b)." *SEC v. Zandford*, 535 U.S. 813, 816 n.1 (2002) (citing *United States v. O'Hagan*, 521 U.S. 642, 651 (1997)). To state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b–5, a plaintiff must establish the following six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx*, 563 U.S. at 37–38.

Based on the "text and purpose of § 10(b)," Supreme Court precedent permits an implied "private cause of action" under this statute. *See Matrixx*, 563 U.S. at 37. But for the statute to reach the fraud alleged, a court must consider whether the plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue" or, simply, whether there is a cause of action under the statute. *Lexmark Int'l*, 572 U.S. at 128. To answer this question, courts use the traditional tools of statutory interpretation. *Id.*

### I.B. Purchase or Sale of a Security

Section 10(b) and Rule 10b–5 cover fraud only "in connection with the *purchase or sale* of any security." 18 U.S.C. § 78j(b) (emphasis added); 17 C.F.R. § 240.10b–5. For decades, the Supreme Court has interpreted this language to cover only those who purchase or sell a security. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749 (1975); *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1091–92 (1991); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007). Indeed, only purchasers or sellers of securities have a right of action. *Tellabs*, 551 U.S. at

14

318. In following the Supreme Court, the Sixth Circuit has held that "standing is not accorded to a plaintiff if his purchase or sale occurs before the alleged fraudulent conduct, or after the alleged fraudulent conduct was exposed." *Marsh v. Armada Corp.*, 533 F.2d 978, 981–82 n.3 (6th Cir. 1976) (citations omitted); *see Gaudin v. KDI Corp.*, 576 F.2d 708, 711 (6th Cir. 1978) (explaining that there must be an actual purchase or sale of a security for a securities fraud claim).

Here, Plaintiffs do not identify when they became unitholders of or lenders to Locus Solutions.  Instead, they allege only that they were "unitholder[s] at all times material to the allegations in this complaint."  (ECF No. 1, ¶¶ 17–24, PageID #6–7.)  Presumably, Plaintiffs purchased their securities between 2014 (when Locus Solutions was founded) and 2021 (when the complaint begins detailing the company's efforts to raise capital).  (*Id.*, ¶¶ 2, 4 & 35, PageID #2 & #35.)  Indeed, Plaintiffs necessarily must have purchased their securities by 2021; otherwise, they could not have converted their investments in the subsidiaries into investments into the holding company.  (*Id.*, ¶¶ 35–45, PageID #8–10.)  But the alleged fraud about which Plaintiffs complain occurred between 2021 and 2023—*after* Plaintiffs' investments in Locus Solutions.  (*Id.*, ¶¶ 38–45, 77–79 & 102–10, PageID #9–10, #16 & #20–22.)  And Plaintiffs concede that their purchases of the securities are unrelated to the alleged misrepresentations or omissions at issue.  (ECF No. 28, PageID #288–89.)

Because Plaintiffs' purchases of securities and investments precede the alleged fraud, Plaintiffs cannot maintain their claims for fraud under Section 10(b) and Rule 10b–5.  *Marsh*, 533 F.2d at 981–82 n.3.  Logically, Plaintiffs cannot rely on

15

statements made after their purchases or state a claim based on post-purchase misrepresentations and omissions. *Sinay v. Lamson & Sessions Co.*, 752 F. Supp. 828, 832 (N.D. Ohio 1990) (citing *Marsh*, 533 F.3d at 982 n. 3).

To overcome the statutory requirement that a defendant must commit fraud in connection with the purchase or sale of a security, Plaintiffs characterize the post-purchase statements, omissions, and events beginning in 2021 (the conversions of their interests, amendments to notes, and restructuring of investments) as new purchases of securities. (ECF No. 28, PageID #288–89.) They rely on out-of-circuit cases to argue that these changes to the form of their investments satisfy the requirement for the purchase or sale of a security. *See 7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 226 (5th Cir. 1994); *Sommer v. PMEC Assocs. & Co.*, No. 88-cv-2537, 1993 WL 361660, at *7 (S.D.N.Y. Sept. 14, 1993) (citing *Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir. 1977)). But those authorities require "such significant change in the nature of the investment or in the investment risks as to amount to a new investment." *Abrahamson*, 568 F.2d at 868. Or they outline the judicially created forced-seller exception, which depends on a fundamental alteration in an investment through a merger, acquisition, or liquidation. *7547*, 38 F.3d at 226.

On the allegations in the complaint, the changes in Plaintiffs' interests in Locus Solutions do not rise to the level of a significant change in or fundamental alteration to their investments to bring the facts within the ambit of these authorities. After the changes to their investments, the allegations show that Plaintiffs fundamentally had the same interests and rights as before, particularly

16

within the capital structure of this early-stage venture. Indeed, Plaintiffs complain that they "would not have agreed to change the date of maturity of their notes or to shift their investment from an operating subsidiary with virtually no debt to what turned out to be a debt-riddled holding company." (ECF No. 1, ¶ 45, PageID #10.) At most, then, they allege a change in value of the securities they already held—not a new purchase or sale, actual or constructive. But without the purchase or sale of a security, Plaintiffs cannot maintain their claims under Section 10(b) and Rule 10b–5. *Marsh*, 533 F.2d at 981–82 n.3. Nor do the allegations in the complaint, construed in Plaintiffs' favor, constitute an actual or constructive purchase, sale, or other realization event or provide another metric by which to measure damages. *See Virginia Bankshares*, 501 U.S. at 1091–92. Without such a remedial point of departure, Plaintiffs do not come within the reach of Section 10(b) or Rule 10b–5.

For these reasons, Plaintiffs do not satisfy the requirement for the purchase or sale of a security. Therefore, they fail to state a claim for securities fraud under Section 10(b) and Rule 10b–5 as a matter of law. In so determining, the Court is mindful to avoid expanding judicially created causes of action. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 165–67 (2008). Indeed, Section 10(b) "must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation." *Zandford*, 535 U.S. at 820 (citing *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982)). On this score, Plaintiffs really complain about the loss of valuable intellectual property, which provided the foundation for their investments in Locus Solutions. Those allegations might state

17

claims under State law, but they do not arise in connection with the purchase or sale of securities on the facts alleged. In that regard, Plaintiffs more closely resemble members of the plaintiff class in *Blue Chip Stamps* who did not purchase or sell securities and instead took no action in reliance on deceptive statements or omissions, which Section 10(b) and Rule 10b–5 do not protect.

Accordingly, the Court **GRANTS** Defendants' motions for judgment on the pleading and **DISMISSES** Count I for federal securities fraud.

## II. State-Law Claims (Counts II through IX)

Having determined that Plaintiffs cannot maintain their claim for federal securities fraud, the Court considers whether it has jurisdiction over Plaintiffs remaining claims: Ohio securities fraud (Counts II and III); common-law fraud (Count IV); breach of fiduciary duties (Counts V and VI); right to vote (Count VII); right to company oversight (Count VIII); and civil conspiracy (Count IX). (ECF No. 1, ¶¶ 102–79, PageID #20–40.) None of the remaining claims present a federal question, and Plaintiffs requested that the Court exercise supplemental jurisdiction over these claims. (*Id.*, ¶ 15, PageID #6–7.)

Under federal law, "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a). This grant of jurisdiction brings all claims arising from a common nucleus of operative fact before the Court. *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 588 (6th Cir. 2016).

18

Even then, a court "may decline to exercise supplemental jurisdiction" in certain circumstances.  28 U.S.C. § 1367(c).  Supplemental jurisdiction "is a doctrine of discretion."  *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).  To determine whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity[.]"  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also James v. Hampton*, 592 F. App'x 449, 462–63 (6th Cir. 2015) (quoting *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1882 (6th Cir. 1993)).

Section 1367(c)(3) provides that a district court may decline to exercise supplemental jurisdiction where (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.  28 U.S.C. § 1367(c)(3).  When deciding whether to invoke supplemental jurisdiction, "a federal court should consider and weigh . . . the values of judicial economy, convenience, fairness, and comity."  *Carnegie-Mellon*, 484 U.S. at 350 (citing *Gibbs*, 383 U.S. at 726–27).

After reviewing the record, the Court declines to exercise its discretion to retain supplemental jurisdiction over Plaintiffs' remaining claims under State law. The Court dismissed the only claim over which it has original jurisdiction.  Also, the remaining claims involve State laws over which the local courts are better positioned

19

to interpret and apply.  Further, because the case remains at the pleading stage, judicial economy favors the Court not exercising supplemental jurisdiction.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Mr. Lefkowitz's motion to deem his reply timely (ECF No. 35) and **GRANTS** Defendants' motions for judgment on the pleadings on Count I (ECF No. 21; ECF No. 27).  Further, the Court **DECLINES** to exercise supplemental jurisdiction over Plaintiffs' State-law claims and **DISMISSES** Plaintiffs' State-law claims **WITHOUT PREJUDICE**.

**SO ORDERED.**

Dated:  March 27, 2026

J. Philip Calabrese
United States District Judge
Northern District of Ohio